IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

KELLI J. POPE,                          )
                                        )
                    Plaintiff,          )
                                        )
             v.                         )    Case No.
                                        )    12-0594-CV-W-REL-SSA
CAROLYN W. COLVIN, Acting               )
Commissioner of Social Security,        )
                                        )
                    Defendant.          )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Kelli Pope seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Title II of the

Social Security Act ("the Act").  Plaintiff argues that the ALJ failed to give proper weight

to the opinion of plaintiff's treating therapist, Shannon Johnston, and her treating

physician, Dr. Steelman; and that the ALJ improperly discredited plaintiff's testimony

that she has trouble concentrating.  I find that the substantial evidence in the record as

a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, plaintiff's

motion for summary judgment will be denied and the decision of the Commissioner will

be affirmed.

## I.    BACKGROUND

On June 21, 2010, plaintiff applied for disability benefits alleging that she had

been disabled since June 24, 2009.  Plaintiff's disability stems from degenerative disc

disease of the lumbar spine, mood disorder, anxiety disorder, and personality disorder.

Plaintiff's application was denied on August 19, 2010.  On July 13, 2011, a hearing was

held before an Administrative Law Judge.  On August 11, 2011, the ALJ found that

plaintiff was not under a "disability" as defined in the Act. On April 20, 2012, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of

choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

Yes = not disabled.
No = go to next step.

3

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

>        No = not disabled.
>        Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

>        Yes = disabled.
>        No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

>        No = not disabled.
>        Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

>        Yes = disabled.
>        No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Barbara Myers, in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## Earnings Record

The record shows that plaintiff earned the following income from 1999 through 2011:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1999 | $ 277.08 | 2006 | $ 2,045.70 |
| 2000 | 607.87   | 2007 | 12,780.32 |

4

| 2001 | 1,243.86 | 2008 | 6,546.01 |
| 2002 | 4,105.07 | 2009 | 2,132.49 |
| 2003 | 1,306.17 | 2010 | 0.00 |
| 2004 | 940.10 | 2011 | 0.00 |
| 2005 | 5,070.65 | | |

(Tr. at 131).

**Missouri Supplemental Questionnaire**

Plaintiff spends 30 minutes to an hour at a time playing games on or using a computer (Tr. at 205). She has a driver's license and is able to drive.

**B.    SUMMARY OF TESTIMONY**

During the July 13, 2011, hearing, plaintiff testified; and Barbara Myers, a vocational expert, testified at the request of the ALJ.

**1.    Plaintiff's testimony.**

At the time of the hearing, plaintiff was 27 years old (Tr. at 30). She was married and lived with her husband and two children, ages 7 and 4 (Tr. at 30). Plaintiff lives in a ranch-style house with a washer and driver on the main level of the house (Tr. at 32). Plaintiff has a driver's license (Tr. at 31). Plaintiff testified that at the hearing, since she had been sitting for an hour, her back was hurting and her stomach was "really upset" and she was really tired (Tr. at 32).

Plaintiff has a high school education and some college (Tr. at 33). Plaintiff completed classes to get a Certified Nurse's Assistant license in 2005 (Tr. at 33). Plaintiff's license was still active at the time of the hearing (Tr. at 34).

Case 4:12-cv-00594-REL   Document 14   Filed 09/28/13   Page 5 of 29

Plaintiff's husband supports the family (Tr. at 34). He was doing carpet work but the week of the hearing he started doing road work (Tr. at 34). Doing carpet he made about $30,000 a year -- plaintiff did not know how much he would be earning doing road work (Tr. at 34). He switched to this new job because it is seasonal, meaning he will not work in the wintertime, and he wants to go back to school (Tr. at 35). Plaintiff was getting $256 in food stamps per month and had been receiving that for "a while." (Tr. at 35). She and her husband are buying their home, and they have no form of health coverage (Tr. at 35). The health care she has been getting is income based (Tr. at 35-36). Plaintiff got a worker's compensation settlement after her alleged onset date -- in approximately September of 2010 (Tr. at 36). That was for the injury to her lower back (Tr. at 36). Plaintiff's settlement was around $10,000 but after lawyer fees she got about $6,500 (Tr. at 37). It was based on a 10% whole-body impairment (Tr. at 38).

Since her alleged onset date, plaintiff worked for about two weeks to take phone calls and put information into a data base (Tr. at 38). Plaintiff worked from home but sitting for that long hurt her back so she resigned (Tr. at 38). She continued to look for work -- anything part time (Tr. at 39). She applied at Subway (Tr. at 39). After not being able to do the stay-at-home job, she got discouraged thinking she could not do anything (Tr. at 39).

Plaintiff worked at Liberty Hospital as a CNA from 2007 to 2009 (Tr. at 40). She was lifting a patient bed on an elevator and the tire of the bed fell between the cracks of the elevator and there was no one else there to help her (Tr. at 40). She thought she felt a pop in her hip, so she went to a chiropractor for a while but when it did not get

6

better she was sent to occupational therapy (Tr. at 40). She did that twice and was off on restrictions but after she did not get any better she was sent for an MRI and that is when it was discovered that she had disc profusions in her back (Tr. at 40). Because plaintiff could not perform any of her duties any more, she was let go (Tr. at 40).

Plaintiff worked for Truman Medical Center as a CNA during 2005 and 2006 and left that job because she was pregnant and pulled a muscle in her lower abdomen (Tr. at 41). The hospital put her on restrictions and she never went back to work after having her baby (Tr. at 41). Plaintiff had a lot of earlier jobs earning less than $500 each -- those were waitressing jobs (Tr. at 41). She did work at Pizza Hut full time as a waitress; she was there for about a year and a half (Tr. at 41).

Plaintiff does not drink alcohol (Tr. at 42). It had been "months and months" since she'd had anything to drink because it hurts her stomach (Tr. at 42). Plaintiff started using methamphetamine when she was 18 (Tr. at 43). She used it for two years (Tr. at 43). She used cocaine a couple times when she was 17 (Tr. at 43). Plaintiff started using marijuana when she was 12 (Tr. at 43). She said that last time she used it had "probably been at least a year" (Tr. at 43). Between her alleged onset date and about a year ago, plaintiff was using a couple joints a couple times every three months or so (Tr. at 43-44). Plaintiff attended Narcotics Anonymous a couple times when she was somewhere around 20 or 22 (Tr. at 44).

Plaintiff takes Percocet (narcotic) and muscle relaxers for her back pain (Tr. at 44-45). She's had injections and "hot and cold therapy" but no surgery (Tr. at 45). With taking medication, plaintiff's pain level is at least an 8 out of 10 or higher (Tr. at

7

45). It is at a 5 constantly, but it is at an 8 the majority of the time (Tr. at 45). During the hearing she said her pain was about a 6 (Tr. at 45).

Plaintiff goes to Samuel Rodgers Health Center for mental health treatment (Tr. at 45-46). She currently takes Lithium, Lamotrigine (which is also Lamictal), and she takes Resinol and Ativan as needed (Tr. at 46). When she takes her medication as directed, her symptoms are better -- it minimizes her symptoms a little bit (Tr. at 46). Her manic episodes are shorter, she is not depressed for as long (Tr. at 47). Plaintiff spends time with family, and her friends come to her house to visit (Tr. at 51). They just sit and talk or watch movies (Tr. at 51-52). She went to a drive-in a couple weeks before the hearing (Tr. at 52). She went to a casino for New Year's Eve (Tr. at 52). A couple times a month, plaintiff will eat out at Red Robin or 54th Street Bar and Grill (Tr. at 52-53). In the summer of 2009, plaintiff went on a vacation to Florida, and the following year she went to Colorado (Tr. at 53). She went to the beach and to Disneyland, and she visited her cousin in Colorado (Tr. at 53). She flew to Florida and was there for seven days (Tr. at 53). She drove to Colorado and was in the car 4 to 5 hours two days in a row (Tr. at 54). She was there for a week (Tr. at 54). She drove up to Pike's Peak and "just drove around and saw lots of stuff." (Tr. at 54).

Plaintiff can get up and shower and dress without any assistance (Tr. at 47). She can drive a car and drives three or four times a week to the grocery store or the doctor (Tr. at 47). She can drive alone, she can prepare food for herself and her family for the most part (Tr. at 47). Her kids eat cereal or Pop Tarts for breakfast, and sandwiches or ravioli for lunch (Tr. at 47). She can water the garden with a hose (Tr. at

51). Plaintiff can shop for groceries and personal items and can make "little trips"
herself, but for bigger shopping trips someone goes with her (Tr. at 48). Plaintiff can do
dishes and load the dishwasher, but bending to load the dishwasher hurts her back (Tr.
at 48). Plaintiff can put laundry in the washer and can fold clothes for about 15 minutes
(Tr. at 48). Sitting, bending and twisting are the hardest on her back (Tr. at 48).
Plaintiff cannot make the bed, dust, sweep, mop or vacuum (Tr. at 49). Plaintiff has a
personal computer and uses it for about 30 minutes a day (Tr. at 49). She has a
Facebook account with about 150 friends (Tr. at 49-50). She uses Facebook on her
phone most of the time (Tr. at 50). She is pretty active on her phone (Tr. at 50). She
pays the family's bills, and she can look things up on Google (Tr. at 50).

Plaintiff can walk about a half a mile at a time, stand for 15 to 20 minutes at a
time, and sit for 10 minutes at a time (Tr. at 54-55). She has no trouble using her
hands (Tr. at 55). She can climb about 15 stairs (Tr. at 56).

During a typical day, plaintiff spends her time in bed or sitting on the couch (Tr.
at 56). She helps her kids with breakfast, but then she rests and she sleeps a lot (Tr. at
56). She has anxiety issues and has gone to the emergency room with "ridiculously
high" blood pressure as a result (Tr. at 56). She feels sad and useless because she is
not working (Tr. at 56).

**2.      Vocational expert testimony.**

Vocational expert Barbara Myers testified at the request of the Administrative
Law Judge. The first hypothetical involved a person with the same residual functional
capacity the ALJ determined plaintiff retains, and the vocational expert testified that

such a person could not do any of plaintiff's past relevant work but could be a retail

worker with 27,000 in Missouri and 1,500,00 in the country, a folding machine operator,

with 800 in Missouri and 31,000 in the country, or a machine tender, with 1,700 in

Missouri and 59,000 in the country (Tr. at 58).  Adding a sit-stand option less frequently

than every 10 minutes, the person could still perform the jobs of folding machine

operator, office helper, or document preparer (Tr. at 59).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Deborah Van Vleck entered her opinion on August 19,

2011 (Tr. at 9-17).  Plaintiff's last insured date was September 30, 2012 (Tr. at 11).

Step one.  Plaintiff has not engaged in substantial gainful activity since her

alleged onset date (Tr,. at 11).

Step two.  Plaintiff's severe impairments include degenerative disc disease of the

lumbar spine, mood disorder not otherwise specified, anxiety disorder, and personality

disorder (Tr. at 11).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr.

at 11-12).

Step four.  Plaintiff retains the residual functional capacity to perform light work

except that she is limited to lifting 10 pounds frequently and 20 pounds occasionally;

she can sit, stand, and walk for up to 6 hours each per workday; she can occasionally

climb ramps and stairs; she can never climb ladders, ropes, or scaffolds; she can

occasionally balance, stoop, crouch, kneel and crawl; she must avoid hazardous and

unprotected heights; she is limited to tasks learned in 30 days or less and involving no

Case 4:12-cv-00594-REL   Document 14   Filed 09/28/13   Page 10 of 29

more than simple work-related decisions and simple changes; and she can occasionally interact with the public, coworkers, and supervisors (Tr. at 12-15). With this residual functional capacity, plaintiff is unable to perform any of her past relevant work (Tr. at 15).

Step five. Plaintiff was 25 years old on her alleged onset date, has a high school education, and can communicate in English (Tr. at 16). She is capable of performing other jobs available in significant numbers such as folding machine operator, retail marker or machine tender (Tr. at 16-17). Therefore, plaintiff is not disabled (Tr. at 17).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

Case 4:12-cv-00594-REL   Document 14   Filed 09/28/13   Page 11 of 29

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> The claimant is a 27-year-old female alleging disability based on the above-listed impairments. During the hearing, the claimant testified to symptoms she experienced from her impairments. The claimant testified that her back pain began following a work-related injury. She testified that she often experiences back pain while sitting. The claimant takes Percocet and muscle relaxers for her pain. On a scale of 0-10 (0 = no pain; 10 = ER-level pain), the claimant rated her pain between a 5 and 8.

With respect to her mental impairments, the claimant testified that she has a short temper and feels depressed. The claimant testified to taking lithium, and that the medication helps. The claimant also testified that she has anxiety attacks and experiences shortness of breath and her heart races.

The claimant also reported having a long history of cannabis abuse.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The claimant's back impairment leads to the above-stated residual functional capacity limitations.  An MRI of the claimant's lumbar spine taken June 12, 2009, showed that at the L2-L3 level, the claimant had right paracentral disc protrusion causing right lateral recess stenosis.  There were no definite mass effects on the exiting L2 nerve root. That MRI also showed a small disc protrusion at L5-S1 without significant mass effect on the exiting nerve roots.  Treatment records dated July 9, 2009, reflect the claimant reported that she was feeling "much better" with respect to her back pain, and that she was able to resume most of her activates during the day, but as the day wore on, she had increasing pain towards the evening.  Records from July 20, 2009, reflect that the claimant had undergone two transforaminal injections with good improvement and that her radiating leg pain was markedly improved.  The record does not appear to contain medical evidence showing any worsening of the claimant's back pain.

Similarly, the claimant's medical records show that the limitations from her mental-health impairments are not as severe as she alleges. With respect to her anxiety, the claimant noted having relief with benzodiazepine.  Indeed, records dated November 2010 show that the claimant reported sleeping much better, having a more calm thought process, and being less irritable.

It is clear that the limiting affects of the claimant's impairments are not as significant as she alleges.  Indeed, the claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.  For example, the claimant testified that she has a driver's license and drives 3-4 times per week. The claimant also testified that she is able to prepare food for herself and family, that she shops for groceries and personal items by herself, and that she can do dishes and load the dishwasher, although it hurts her to bend. Additionally, the claimant testified that she does laundry and can fold clothes for a while. Thus, while during the hearing,

the claimant testified to limited activities of daily living, which included spending most of the day in bed, or on the couch, those allegations are simply unsupported.

Moreover, the claimant acknowledged she continued to seek employment after the alleged onset date. The claimant indicated she could not find a suitable job. The claimant's inability to secure a job could be due to many factors unrelated to an alleged disability. Notably, the inability to secure employment is not the same as the inability to perform basic work activities if hired.

Additionally, despite the allegations of symptoms and limitations preventing all work, the record reflects that the claimant went on a vacation since the alleged onset date. The claimant traveled to Florida, where she went to the beach and Disney[land]. She also testified to going on a two-day drive to Denver, Colorado, where she stayed for one week. While in Denver, she testified that she drove around "and saw a lot of stuff." Although a vacation and a disability are not necessarily mutually exclusive, the claimant's decision to go on a vacation tends to suggest that the alleged symptoms and limitations may have been overstated.

Finally, the record contains allegations that the claimant has difficulty concentrating. The undersigned observed the claimant throughout the hearing. The claimant did not demonstrate or manifest any difficulty concentrating during the hearing. During the time when the claimant was being questioned, the claimant appeared to process the questions without difficulty, and to respond to the questions appropriately and without delay. The claimant paid attention throughout the hearing.

(Tr. at 13-15).

The ALJ properly analyzed the Polaski factors in finding plaintiff's testimony not entirely credible. Although plaintiff said she could only sit for 10 minutes at a time, she watches movies with friends and family, she went to a drive-in shortly before the hearing, she went tubing at a lake with friends (Tr. at 545), she flew on a plane from Missouri to Florida and back, she sat in a car during a two-day drive to Colorado and the same distance back, she sat in a car during a ride to the top of Pike's Peak (which is a lengthy trip compared to an inability to sit for no more than 10 minutes at a time),

14

and spent the rest of the seven-day trip "driving around a lot" which necessarily entails sitting in a car, and she was able to lose a significant amount of weight by going to the gym (Tr. at 625).  Plaintiff testified that she can stand for no more than 15 to 20 minutes at a time; however, as the ALJ noted, this is entirely inconsistent with the ability to go to Disneyland.

Plaintiff challenges the ALJ's reliance on her own observations of plaintiff during the hearing, i.e., that she appeared to have no difficulty concentrating, answering questions quickly and appropriately.  It is permissible for an ALJ to cite her personal observations of a claimant's demeanor.  Johnson v. Apfel, 240 F.3d 1145, 1147-1148 (8th Cir. 2001) ("The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations")(citing Smith v. Shalala, 987 F.2d 1371, 1375 (8th Cir.1993)).  I also note that plaintiff described her pain as a 6 out of 10 in intensity during the hearing, yet she was able to answer questions timely and appropriately despite that advanced level of pain. This is another example of plaintiff possibly believing that the pain she was experiencing was a "6" on a pain scale, but that also gives the ALJ an opportunity to estimate what an 8 out of 10 would be, which is how plaintiff described her pain a majority of the time.  I also note here that plaintiff reported her pain as a 2 out of 10 in February 2010, a 0 out of 10 on two different occasions in April 2010, a 0 out of 10 in June 2010, a 0 out of 10 on two occasions in October 2010, a 0 out of 10 on two occasions in November 2010, and a 0 out of 10 (noting that she was sore only when she went to the gym) in March 2011, which is inconsistent with her allegations in connection with this disability case.  On

15

November 10, 2010, plaintiff's psychiatrist noted, "She reported she only occasionally takes Percocet p.r.n. [as needed] from a primary care doctor for her pain regarding her low back issue. Occasionally, she will substitute Advil for that." (Tr. at 600). Plaintiff reported in April 2010 that she was "babysitting now."

Plaintiff challenges the ALJ's analysis of the Polaski factors, specifically arguing that the ALJ "overstated" plaintiff's daily activities. Contrary to plaintiff's argument, the ALJ did not conclude that plaintiff's activities (including her family vacations) meant she could perform full-time work. Daily activities are one factor explicitly mentioned in Polaski, and it was certainly appropriate for the ALJ to cite plaintiff's activities as part of her credibility discussion. Curran-Kicksey v. Barnhart, 315 F.3d 964, 969 (8th Cir. 2003) ("Although participation in these activities does not dispositively show that Ms. Curran-Kicksey's complaints of pain were exaggerated, they certainly were appropriate matters for the ALJ to consider under Polaski."); Clevenger v. Soc. Sec. Admin., 567 F.3d 971, 976 (8th Cir. 2009) (cases send "mixed signals" about the importance of daily activities, but under caselaw and the regulations, it is appropriate for the ALJ to cite activities). For example, plaintiff described activities like going to the grocery store, taking care of her two small children albeit with help, driving, watering her garden, preparing simple meals, doing some laundry, caring for her home, going to a drive-in, watching movies with friends, spending time on her computer, and using technology to entertain herself and look up information about her children's illnesses or other information. While not determinative, such activities suggest she retains the physical and mental capacity to handle simple, self-directed tasks which is the limitation

16

imposed by the ALJ in the residual functional capacity. Additionally, as pointed out above, plaintiff's activities directly conflicted with some of her own claims about her limitations.

Finally, plaintiff argues that it was unfair for the ALJ to cite the fact that plaintiff continued to look for work after her alleged date of disability. However, a continued search for work may suggest a claimant is not as limited as he claimed. Mitchell v. Sullivan, 907 F.2d 843, 844 (8th Cir. 1990) (claimant admitted he was looking for disability only because he could not find a job). Schaffer v. Astrue, 2010 WL 1438802, *7 (W. D. Mo., April 10, 2010), although not a published opinion, is remarkably similar factually and is instructive on this issue:

> Plaintiff's work history also detracted from the credibility of her subjective allegations. The ALJ correctly noted that Plaintiff had "a sporadic work history with no substantial earnings." See Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996). In addition, the evidence suggests that Plaintiff looked for work during the relevant time period. See Mitchell v. Sullivan, 907 F.2d 843, 844 (8th Cir. 1990). Plaintiff argues that her work history does not reveal substantial earnings due to her young age, her attempts to attend community college classes, and her impairments. However, other evidence suggests that Plaintiff had low earnings and a sporadic work history because she felt she was unable to work for reasons unrelated to her impairments. In May 2008, Dr. Hayes noted that Plaintiff wanted to work but did not believe "that there [was] room for an assertive woman in the job market." Dr. Hayes felt that these "long held beliefs about why she [could not] work" kept Plaintiff "anxious and stuck." The ALJ properly considered Plaintiff's work history in assessing the credibility of her subjective allegations.

In this case, plaintiff has a sporadic work history with no substantial earnings. During the years covering her work history, she bounced around from one waitressing job to another, and then attended college to get a CNA certification. She failed to return to her first CNA job because she had a baby. After she hurt her back and had to leave

17

the CNA profession, plaintiff attempted a telephone job at home (with two small children at home) and was unsuccessful because (she claims) she could not sit long enough to perform it. This is not persuasive since plaintiff was able to sit for two days to drive to Colorado, was able to sit in the car during her seven-day vacation there to drive to the top of Pike's Peak and to drive around a lot sightseeing, and was able to sit in the car during the nine to ten hours it took to return to Missouri. The job she held working from home did not, according to her testimony, last much longer than her vacation to Colorado. However, she was able to sit for the vacation and not for the job. In any event, plaintiff's inability to perform a telephone job at home while her two small children were there was her basis for believing she could not do any work (again, according to her testimony). Yet she looked for restaurant work, which is clearly more physically strenuous than a sit-down job, and it involves a lot more public contact than the jobs the ALJ found she could perform.

Based on the substantial evidence in the record as a whole, I find that the ALJ properly discredited the subjective allegations of disabling symptoms.

## VII.    OPINION OF PLAINTIFF'S THERAPIST

Plaintiff argues that the ALJ erred in discrediting the opinion of plaintiff's treating therapist, Shannon Johnston, and her treating physician, Dr. Steelman.

<u>Shannon Johnston</u>

On February 15, 2011, Shannon Johnston, a licensed clinical social worker, completed a mental residual functional capacity assessment wherein she found plaintiff was moderately limited in the ability to remember locations and work like procedures;

understand, remember, and carry out very short and simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting (Tr. at 610-612). She found that plaintiff is markedly limited in her ability to understand, remember, and carry out detailed instructions; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; interact appropriately with the general public; travel in unfamiliar places or use public transportation; set realistic goals or make plans independently of others. She found that plaintiff was extremely limited in her ability to work in coordination with or proximity to others without being distracted by them, in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and in her ability to perform at a consistent pace without an unreasonable number and length of rest periods.

The Social Security Administration issued Social Security Ruling (SSR) 06-3p, 71 Fed. Reg. 45,593 (Aug. 9, 2006) which clarified how it considers opinions from sources who are not what the agency terms "acceptable medical sources." SSA separates information sources into two main groups: "acceptable medical sources" and "other sources." It then divides "other sources" into two groups: medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007).

Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. § § 404.1513(a), 416.913(a)

(2007).  According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others:

1.  Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment.  Id.

2.  Only acceptable medical sources can provide medical opinions.  20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007).

3.  Only acceptable medical sources can be considered treating sources.  20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).

In the category of "other sources," again, divided into two subgroups, "medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. "Non-medical sources" include school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p.  Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007).   "Instead, there must be evidence from an 'acceptable medical source' for this purpose.  However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  Id. quoting SSR 06-3p.

Clearly Ms. Johnson, a licensed clinical social worker, is not an acceptable medical source. Therefore, her opinion is relevant only to help the ALJ determine the severity of plaintiff's impairment and how it affects her ability to function.

Plaintiff actually only saw Ms. Johnston on a handful of occasions, and each of those records is about a paragraph long.

On October 2, 2009, only plaintiff's allegations are listed (Tr. at 563). On October 20, 2009, Ms. Johnston noted that plaintiff started using methamphetamine at age 17 or 18, started using marijuana at age nine and used it daily (Tr. at 564-567). She observed that plaintiff had appropriate hygiene and grooming, good eye contact, normal speech, logical and organized thoughts, good judgment, good insight, intact abstract thinking, intact attention, intact concentration, intact memory, she was alert and oriented times four. The only "abnormal" observations were that plaintiff appeared fidgety and anxious.

On November 11, 2009, Ms. Johnston noted only plaintiff's statements which included transportation problems, financial problems, and polysubstance dependency (Tr. at 563).

On December 1, 2009, plaintiff saw Ms. Johnston and reported stress over a neighbor falling at her house and wanting insurance money, arguments with her husband over his family, and polysubstance abuse (Tr. at 562). Plaintiff was observed to be fidgety.

On December 16, 2009, plaintiff complained about her dread of having to spend Christmas with certain relatives (Tr. at 562). Ms. Johnston observed that plaintiff

21

appeared to be anxious but kept her sense of humor.

On February 3, 2010, Ms. Johnston's only observation was "anxious and cheerful" (Tr. at 561).

On April 8, 2010, plaintiff reported having used marijuana for 21 days out of the past month (Tr. at 561). She also used Ativan, Xanax, and Percocet, and she reported craving methamphetamine.

On May 10, 2010, plaintiff told Ms. Johnston she had a good interview at Roto Rooter and thought she had a good chance of getting a job there (Tr. at 560). She admitted using marijuana in the past month. The only observation made by Ms. Johnston was "cheerful."

On June 16, 2010, plaintiff told Ms. Johnston she was working out, doing home improvements, and was going to Colorado the next month (Tr. at 560). Ms. Johnston's observations consisted of "jovial, somewhat cheerful."

On July 22, 2010, plaintiff told Ms. Johnston that she may start working out to decrease her anxiety (Tr. at 608). She discussed having had a disagreement with her husband that resulted in a physical altercation.

On October 19, 2010, plaintiff discussed her "recent job loss over 'walking out'" (Tr. at 608-609). Plaintiff continued to use marijuana. The only observation by Ms. Johnston was "agitated."

On October 26, 2010, plaintiff talked about a family feud over the upcoming holidays, "called attorney for more forms, functional capacity assessment" (Tr. at 607). The only observation by Ms. Johnston was "moody".

22

There is absolutely no basis in these records for the extreme limitations found by Ms. Johnston in the residual functional capacity assessment. The only negative observations were agitated, moody, fidgety and anxious. And there were just as many observations of plaintiff being cheerful, jovial, and maintaining a sense of humor. Ms. Johnston's treatment records show no allegations by plaintiff of difficulty in any of the areas Ms. Johnston found plaintiff was very limited. Her opinion deserves no weight.

Not only is her opinion contradicted by her own records, it is also contradicted by the treatment records of Cindy Ruttan, D.O, plaintiff's psychiatrist.

On April 13, 2010, plaintiff saw Cindy Ruttan, D.O., a psychiatrist (Tr. at 553-557). Dr. Ruttan noted a past history of alcohol use, cocaine "on and off". Plaintiff last used drugs four days earlier. She said that she was using Percocet, "Xanax if I can find it", and Ativan as needed. Plaintiff reported having used cocaine, methamphetamine, and crack while she worked at Pizza Hut. She used "a lot" of methamphetamine for a six-month period. Plaintiff said her finances were stressing her out terribly. She can "sit and play on [the] computer for hours." Dr. Ruttan observed that plaintiff was alert and oriented times three, had normal speech, good eye contact, no abnormal psychomotor behaviors. Her insight was fair.

On June 16, 2010, plaintiff saw Dr. Ruttan (the same day Ms. Johnston observed plaintiff to be jovial and somewhat cheerful) (Tr. at 552). Dr. Ruttan observed that plaintiff was alert and oriented, her dress and affect were appropriate, her speech was goal directed, her memory was intact, cognition was intact, judgment was impulsive but intact, impulse control was good, insight was fair. Plaintiff continued to use marijuana.

23

Dr. Ruttan told plaintiff she needed to stop using all drugs and alcohol.

On June 22, 2010, plaintiff saw Dr. Ruttan (Tr. at 546). Plaintiff talked about her worker's compensation case and said she had filed for disability. Plaintiff said she wanted to move but could not because she was "financially poor." Plaintiff was observed to be alert times four with appropriate dress, appropriate affect, goal directed speech, intact memory, intact cognition, impulsive but intact judgment, fair impulse control, and good insight.

On July 8, 2010, plaintiff saw Dr. Ruttan (Tr. at 545). Plaintiff reporting having gone water tubing at the lake with friends. Dr. Ruttan observed that plaintiff was oriented times four, her dress was appropriate, affect was appropriate, her speech was goal directed, her memory was intact, her cognition was intact, her judgment was impulsive but intact, and insight was fair.

On July 22, 2010, plaintiff saw Dr. Ruttan (Tr. at 606). Plaintiff reported increased symptoms after having forgotten to take her medication for several days. Plaintiff reported having gone swimming. Plaintiff's mental status exam was entirely normal except her judgment was noted to be intact but impulsive.

On August 26, 2010 plaintiff saw Dr. Ruttan (Tr. at 605). Plaintiff had stopped her antidepressant two and a half weeks earlier, she reported having consumed alcohol the previous week. Her mental status exam was normal except her judgment was observed to be immature yet intact.

On October 7, 2010, plaintiff saw Dr. Ruttan (Tr. at 604). Plaintiff reported having consumed alcohol a few days earlier and using marijuana about two weeks

24

earlier.  Her mental status exam was normal except her judgment was noted to be impulsive at times.

On October 11, 2010, plaintiff saw Dr. Ruttan (Tr. at 603).  Plaintiff's mental status exam was normal except that she was noted to be agitated and tearful.

On October 13, 2010, plaintiff saw Dr. Ruttan (Tr. at 636).  Plaintiff had stopped another medication and "didn't follow the protocol as prescribed."  Plaintiff was off all of her medications for four days.  Her mental status exam was entirely normal.

On October 21, 2010, plaintiff saw Dr. Ruttan (Tr. at 602).  Plaintiff reported improvement in her symptoms with her medication.  Her mental status exam was entirely normal except she was noted to have reported agitation at times.

On November 10, 2010, plaintiff's mother came to see Dr. Ruttan with plaintiff and talked about plaintiff's childhood (Tr. at 598-600).  As a result of the mother's description of plaintiff's childhood, Dr. Ruttan changed her diagnoses to bipolar disorder, panic disorder, and conduct disorder as a teenager, along with marijuana abuse, polysubstance dependency history, and alcohol abuse history.

On November 23, 2010, plaintiff saw Dr. Ruttan and reported sleeping much better (Tr. at 597).  Plaintiff's mental status exam was entirely normal.

On December 27, 2010, plaintiff saw Dr. Ruttan and reported that she had had a stressful holiday (Tr. at 635).  She had consumed alcohol.  Plaintiff's mental status exam was entirely normal.

On January 24, 2011, plaintiff saw Dr. Ruttan and said she was doing okay on her medications (Tr. at 634).  Plaintiff reported that she had read three books, and Dr.

Ruttan noted this in connection with plaintiff's attention span. Plaintiff's mental status exam was entirely normal.

On March 11, 2011, plaintiff saw Dr. Ruttan and said she felt 60% better (Tr. at 626). Her mental status exam was entirely normal.

On April 19, 2011, plaintiff saw Dr. Ruttan and said that she had been losing weight due to going to the gym, her symptoms were noted to be stable (Tr. at 625). Her mental status exam was entirely normal.

Dr. Ruttan performed thorough mental status exams on every visit, she saw plaintiff more often than Ms. Johnston did, and she is an acceptable medical source.

Based on the treatment records of plaintiff's mental health providers, the ALJ properly gave no weight to the mental residual functional capacity assessment provided by plaintiff's social worker, Ms. Johnston.

Scott Steelman, D.O.

Plaintiff saw Dr. Steelman on June 10, 2009, and complained that she was lifting a patient bed out of the elevator when she felt pain in her hip (Tr. at 371). The injury date is listed as January 28, 2008 -- a year and a half earlier. Plaintiff indicated that she was taking Percocet and Vicodin, both narcotics, in addition to a muscle relaxer (Flexeril). On exam, Dr. Steelman found that plaintiff's gait was normal, her range of motion was normal, sensation in the lower extremities was normal, toes standing and walking could be performed, strength testing in the lower extremities was normal. Plaintiff had pain and tenderness. Dr. Steelman assessed sacroiliac sprain and sciatica. He requested an MRI and put her on modified duty to lift 10 pounds or less,

no patient assists or transfers, and no pushing or pulling over 10 pounds.  This was in connection with her employment at Liberty Hospital and in connection with her worker's compensation claim.  Six days later Dr. Steelman discharged plaintiff from his care.  His restrictions were based on plaintiff's worker's compensation claim and were made before she underwent back injections which she found very helpful.  Dr. Steelman did not see plaintiff after her alleged onset date.

In the month following Dr. Steelman's work restrictions (as plaintiff was still working at the time those restrictions were recommended), the following occurred.  On June 12, 2009, plaintiff went to the emergency room stating that she only had one day of her medications left.  On June 19, 2009, she went to the emergency room and was noted to be a smoker, she was able to go from a seated to standing position without difficulty, she had normal stability of the lumbar spine, and "very little" sacroiliac joint tenderness (Tr. at 265).  Her MRI showed a herniated disk at L2-3 and L5-S1 (Tr. at 266).  "I think that if she does the proper abdominal strengthening exercises she has been taught, she will hopefully be able to continue with her nurse assistant activities."

On June 26, 2009, plaintiff told Shavonne Danner, M.D., that she was frustrated because Liberty Hospital had her cleaning out refrigerators as light duty (Tr. at 272).  "We had another nice discussion in regard to abdominal strengthening exercises for this nice lady, and I think that until she has better lumbar control that she is likely to have discomfort whether she is cleaning out refrigerators or picking up her child".

On July 9, 2009, plaintiff reported that she was "much better" after having injections in her back and that she was able to resume most of her activities during the

day but experienced more pain in the evening (Tr. at 270). She was overall much more active. The medical records reflect that plaintiff continued to use alcohol and marijuana through at least the end of 2010 -- a year and a half after her alleged onset date. At the same time, she indicated she forgot to take her medications for a couple days and her symptoms worsened, and she stopped her own medications for weeks at a time before reporting that to her doctor which she did on numerous occasions.

The ALJ did not mention Dr. Steelman's recommendations; however, they occurred in connection with work duties while she was still employed and going through treatment for a worker's compensation injury, he discharged her before her alleged onset date, and after those restrictions were recommended plaintiff was able to go tubing at the lake with friends, go to Disneyland, go swimming, go to the gym, and perform all of the other activities which are mentioned in further detail above. The ALJ discussed the same MRI scan mentioned by Dr. Steelman, observed that plaintiff's pain was "much better" in the month after she stopped seeing Dr. Steelman, and discussed all of the other evidence in the record as a whole in assessing plaintiff's residual functional capacity. There is no error here.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

28

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 27, 2013